# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

## BOSTON DIVISION

|  |  |
|---|---|
| FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES; COALITION FOR MERITOCRACY AT UNIVERSITIES,<br><br>               Plaintiffs,<br><br>v.<br><br>HARVARD LAW REVIEW ASSOCIATION; PRESIDENT AND FELLOWS OF HARVARD COLLEGE; BETSY DeVOS, in her official capacity as U.S. Secretary of Education; UNITED STATES OF AMERICA,<br><br>               Defendants. | Civil Action No. 1:18-cv-12105<br><br><br>Oral Argument Requested |

## MEMORANDUM IN SUPPORT OF DEFENDANT HARVARD LAW REVIEW ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ............................................................................................. 2

STANDARD OF REVIEW ........................................................................................... 5

ARGUMENT ................................................................................................................ 6

I.     Plaintiffs Lack Article III Standing........................................................................ 6

II.    Plaintiffs Fail To State a Claim Upon Which Relief Can Be Granted............................. 9

      A.    Plaintiffs Have Not Adequately Alleged That HLRA Receives Federal Funding ...................................................................................... 10

      B.    Plaintiffs Have Not Adequately Alleged That HLRA Is a "Program or Activity" of Harvard University ....................................... 11

      C.    Plaintiffs Have Not Advanced a Cognizable Claim That HLRA Discriminates on the Basis of Race or Sex ......................................... 15

CONCLUSION............................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*ACA Fin. Guaranty Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ...................................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................5, 9, 11, 15, 18

*Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*,
    713 F.3d 1187 (9th Cir. 2013) .................................................................................7

*Berner v. Delahanty*,
    129 F.3d 20 (1st Cir. 1997) ....................................................................................6

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ..........................................................................................8, 12

*Clapper v. Amnesty Int'l, USA*,
    568 U.S. 398 (2013) ............................................................................................6

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000) ...................................................................................13

*Cohen v. Brown University*,
    101 F.3d 155 (1st Cir. 1996) ...............................................................................2, 16

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ...........................................................................................12

*Dep't of Transp. v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986) .........................................................................................10, 11

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016) (Souter, J.) ..............................................................1, 7, 9

*Ezell v. Lexington Insurance Co.*,
    335 F. Supp. 3d 91 (D. Mass. 2018),
    *appeal docketed*, No. 18-2064 (1st Cir. Oct. 29, 2018) .........................................18

*Fisher v. University of Texas at Austin ("Fisher II")*,
    136 S. Ct. 2198 (2016) ..................................................................................2, 17, 18

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) .................................................................................6

*Frazier v. Fairhaven Sch. Comm.*,
    276 F.3d 52 (1st Cir. 2002) ...................................................................................12

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Georgia Republican Party v. SEC*,
   888 F.3d 1198 (11th Cir. 2018) ..............................................................7

*Grutter v. Bollinger*,
   539 U.S. 306 (2003).................................................................16, 18

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016)..................................................................5

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977)..............................................................................7

*Juarez v. Select Portfolio Servicing, Inc.*,
   708 F.3d 269 (1st Cir. 2013)..................................................................5

*Lam v. Curators of the Univ. of Missouri at Kansas City Dental Sch.*,
   122 F.3d 654 (8th Cir. 1997) ...............................................................13

*Lemos v. Bank of America*,
   132 F. Supp. 3d 261 (D. Mass. 2015) .................................................5, 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)..............................................................................8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................6, 7

*Maldonado v. Fontanes*,
   568 F.3d 263 (1st Cir. 2009)................................................................11

*NCAA v. Smith*,
   525 U.S. 459 (1999).............................................................11, 12, 14

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) .................................................................6

*Ouachita Watch League v. U.S. Forest Service*,
   858 F.3d 539 (8th Cir. 2017) .................................................................7

*Regents of Univ. of California v. Bakke*,
   438 U.S. 265 (1978)........................................................................16, 18

*Segelman v. City of Springfield*,
   561 F. Supp. 2d 123 (D. Mass. 2008) .................................................19

*Sexual Minorities Uganda v. Lively*,
   960 F. Supp. 2d 304 (D. Mass. 2013) ...................................................6

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Shotz v. City of Plantation*,
  344 F.3d 1161 (11th Cir. 2003) ...........................................................................12

*Southern Walk at Broadlands Homeowner's Ass'n v.*
  *OpenBand at Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013) ................................................................................7

*Spokeo, Inc v. Robins*,
  136 S. Ct. 1540 (2016) .....................................................................................6, 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  No. 14-cv-14176-ADB, 2017 WL 2407254 (D. Mass. June 2, 2017) ....................2

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................1, 7

*Swanson Group Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ..............................................................................7

*Tennessee Republican Party v. SEC*,
  863 F.3d 507 (6th Cir. 2017) ................................................................................7

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*,
  524 F.3d 315 (1st Cir. 2008) ..............................................................................13

*United States ex. rel. Gagne v. City of Worcester*,
  565 F.3d 40 (1st Cir. 2009) ................................................................................19

*United States ex rel. Cunningham v. Millennium Labs., Inc.*,
  202 F. Supp. 3d 198 (D. Mass. 2016) ...................................................................5

*United States v. AVX Corp.*,
  962 F.2d 108 (1st Cir. 1992) ............................................................................6, 7

*United States v. Sowers*,
  136 F.3d 24 (1st Cir. 1998) ..................................................................................8

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................................6

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ..................................................................................13

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .............................................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

## FEDERAL STATUTES

20 U.S.C. § 1681 ............................................................................................. 1, passim

20 U.S.C. § 1681(a) ......................................................................................................10

20 U.S.C. § 1687(2)(A).................................................................................................12

42 U.S.C. § 2000d ...................................................................................... 1, passim

42 U.S.C. § 2000d-4a(2)(A) .........................................................................................12

## FEDERAL REGULATIONS

28 C.F.R. § 42.102(c)...................................................................................................10

34 C.F.R. § 106.3(b) ....................................................................................................16

34 C.F.R. § 106.11 .......................................................................................................12

## FEDERAL RULES

Fed. R. Civ. P. 10(c) ....................................................................................................13

Fed. R. Civ. P. 12(b)(1).................................................................................................1

Fed. R. Civ. P. 12(b)(6).......................................................................................2, 5, 13

## OTHER AUTHORITIES

Collins Dictionary (2010) ............................................................................................13

Oxford English Dictionary (2015) ...............................................................................12

Secretary of Commonwealth, Corporations Division, *Business Entity Summary:*
     *The Harvard Law Review Association*, http://corp.sec.state.
     ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?FEIN=04210
     4292&SEARCH_TYPE=1 (last visited Feb. 25, 2019).........................................13

Plaintiffs' Amended Complaint does not cure the fatal defects that Defendant Harvard Law Review Association ("HLRA") identified in its original motion to dismiss.  There is a simple explanation why:  The Amended Complaint fails to state a claim as a matter of law, and no amount of repleading can repair that.  Plaintiffs have not included any allegations that would subject HLRA to either Title VI (42 U.S.C. § 2000d) or Title IX (20 U.S.C. § 1681).  Nonetheless, to remedy the statutory violations they allege, Plaintiffs seek extraordinary judicial relief that would transform this Court into an Article III Editor-In-Chief, with the responsibility to oversee HLRA's editor- and article-selection decisions.  The Amended Complaint should therefore be dismissed.

As an initial matter, Plaintiffs Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") and Coalition for Meritocracy at Universities ("CMU") have failed to establish that they have standing to sue.  Under binding Supreme Court and First Circuit precedent, to satisfy the requirements of Article III, an association must expressly identify at least one member who has suffered a cognizable injury.  *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.).  Plaintiffs have done no such thing—even after HLRA highlighted this straightforward requirement in its first motion to dismiss. This Court accordingly lacks jurisdiction and must dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1).

Plaintiffs' claims also fail on the merits.  To state a claim under Titles VI and IX, Plaintiffs must allege that they have suffered discrimination based on race or sex in a "program or activity receiving Federal financial assistance."  *See* 20 U.S.C. § 1681; 42 U.S.C. § 2000d.  Plaintiffs nowhere allege any facts demonstrating that HLRA receives federal funding, and they do not allege facts sufficient to establish that HLRA qualifies as a "program or activity" of Harvard University.

Equally fatal, Plaintiffs have not alleged actionable discrimination.  HLRA's consideration of race and sex is consistent with Supreme Court and First Circuit precedent.  The First Circuit said decades ago that affirmative action is permissible under the civil rights statutes.  *See Cohen v. Brown University*, 101 F.3d 155, 170 n.11, 172 (1st Cir. 1996).  And the Supreme Court has rejected the notion that an entity "discriminates" when it considers applicants' race and sex as part of its admissions or selection processes.  Time and again, the Supreme Court has approved of race- and sex-conscious decision-making, so long as race and sex are used as part of a holistic process, instead of mechanically.  *See, e.g.*, *Fisher v. University of Texas at Austin ("Fisher II")*, 136 S. Ct. 2198, 2208 (2016).  Plaintiffs' claim therefore amounts to a plea for this Court to overturn binding First Circuit and Supreme Court precedent—"something it decidedly cannot do."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, No. 14-cv-14176-ADB, 2017 WL 2407254, at *1 (D. Mass. June 2, 2017).

Because Plaintiffs' allegations fail to satisfy even the most forgiving pleading standard after two attempts, and because HLRA's selection processes are not subject to and do not violate Titles VI and IX under binding Circuit precedent, this Court should dismiss the Amended Complaint with prejudice.  *Ezell v. Lexington Insurance Co.*, 335 F. Supp. 3d 91, 97 n.1 (D. Mass. 2018), *appeal docketed*, No. 18-2064 (1st Cir. Oct. 29, 2018).

## STATEMENT OF FACTS[1]

Plaintiffs FASORP and CMU are "unincorporated nonprofit membership association[s]" that seek to "eliminat[e] the use of race and sex preferences" at American universities.  Amended

---

[1] Solely for purposes of this Motion, and as required under Federal Rule of Civil Procedure 12(b)(6), Defendant HLRA assumes the truth of the facts asserted by Plaintiffs in their Amended Complaint.

Complaint ("Am. Compl."), at ¶¶ 3-4, 36, ECF No. 33.  Plaintiffs allege that their "membership" includes a range of injured individuals—including "[a]t least one" prospective applicant to HLRA and "[a]t least one" author who intends to submit his or her work for publication.  *Id.* at ¶¶ 38–40.[2]

Defendant HLRA "is a student-run organization whose primary purpose is to publish" the *Harvard Law Review* ("the *Law Review*"), "a journal of legal scholarship."  Amended Complaint Ex. 1 ("Ex. 1") at 1, ECF No. 33-1.  "The organization is formally independent of the Harvard Law School."  *Id.*

Plaintiffs' Amended Complaint focuses on two specific components of HLRA's independent operations:  its selection of new members and its selection of articles to publish.  Am. Compl. ¶¶ 9–19.  As relevant to membership selection, HLRA invites forty-eight editors to join each year from the rising second-year class of Harvard law students.  *Id.* ¶ 15.  Of those forty-eight new members, twenty are selected based solely on their scores on an annual writing competition; ten are selected based on a combination of their writing-competition scores and first-year grades; and eighteen are selected "through a holistic but anonymous review that takes into account all available information."  *Id.*  ¶¶ 15–16.  Applicants are not required to provide additional information for consideration through the holistic process, but those who wish to do so can "indicate their racial or ethnic identity, physical disability status, gender identity, sexual orientation, and socioeconomic status."  *Id.* ¶ 17; *see also* Ex. 1 at 5–7 (HLRA's editor-selection policy).  Applicants also may submit an expository statement that "describes aspects of their background not fully captured" elsewhere in the application materials.  Am. Compl. ¶ 17.  Those

---

[2] Although some of the allegations in the Amended Complaint imply that Plaintiffs' membership includes HLRA alumni (Am. Compl. ¶¶ 32–33) and *Law Review* authors (*id.* ¶ 31), Plaintiffs do not actually allege that their membership includes such individuals.  *Compare id.* ¶¶ 38–40 (alleging that "[a]t least one member" of FASORP and CMU is a prospective *Law Review* editor and "[a]t least one member" is a prospective *Law Review* author).

statements are considered only after the writing-competition portion of the applications has been graded. Ex. 1 at 6. In making editor-selection decisions, HLRA "remains strongly committed to a diverse and inclusive membership." Am. Compl. ¶ 16.

As for article selection, HLRA's student editors are solely responsible for selecting the legal scholarship that will be published in the *Law Review*. *Id.* ¶ 9; *see* Ex. 1 at 1 ("Student editors make all editorial and organizational decisions and, together with a professional business staff of three, carry out day-to-day operations."). Much of the scholarship published in the *Law Review* (*e.g.*, notes, recent case comments, and recent legislative comments) is written by its student editors. Ex. 1 at 2. The full-length articles selected for publication in the *Law Review* are written by "professors, judges, and practitioners," and the *Law Review* also solicits book reviews from "recognized experts." *Id.*

FASORP filed suit against HLRA (along with several other defendants) on October 6, 2018. Complaint, ECF No. 1. HLRA moved to dismiss FASORP's initial complaint on December 17, 2018. ECF No. 23. In response, FASORP, joined by CMU, filed an Amended Complaint on January 7, 2019. ECF No. 33. Like the initial complaint, the Amended Complaint alleges that HLRA's editor- and article-selection processes violate Title VI, 42 U.S.C. § 2000d, and Title IX, 20 U.S.C. § 1681.[3] Am. Compl. ¶ 46. Specifically, Plaintiffs assert that HLRA uses holistic review to "discriminate in favor of women, 'underrepresented' racial minorities, homosexuals, and transgendered people when selecting its members and editors, by allowing members of these groups to leapfrog candidates with better grades or better scores on the writing competition." *Id.*

---

[3] The Amended Complaint also includes allegations involving faculty hiring at Harvard Law School. Am. Compl. ¶¶ 23, 41–42, 48. Plaintiffs do not allege that HLRA has any involvement in the Law School's faculty hiring, so this memorandum does not address those allegations.

¶ 18.   Plaintiffs further allege that, in selecting which articles to publish, HLRA "giv[es] preferential treatment to articles written by women or racial minorities."  *Id.* ¶ 19.

To remedy these alleged violations, Plaintiffs request several forms of relief.  *Id.* ¶ 59. *First*, Plaintiffs seek a declaration that HLRA's editor- and article-selection policies violate Title VI and Title IX.  *Id.* ¶ 59(a).  *Second*, they demand an injunction that would require HLRA to enact new article- and editor-selection policies for the *Law Review* that "disavow" any consideration of diversity.  *Id.* ¶ 59(b), (d).  *Third*, they demand injunctive relief that would require HLRA to pre-clear its annual editor-selection decisions with this Court and the Secretary of Education.  *Id.* ¶ 59(e).  *Fourth*, Plaintiffs seek similar pre-clearance of HLRA's article-selection policy, which they claim cannot permit student editors even to know an author's name before accepting the author's piece for publication.  *Id.* ¶ 59(f).

## STANDARD OF REVIEW

"In opposing a motion to dismiss for lack of subject matter jurisdiction . . . , the plaintiff bears the burden of establishing that the Court has jurisdiction."  *United States ex rel. Cunningham v. Millennium Labs., Inc.*, 202 F. Supp. 3d 198, 202 (D. Mass. 2016).  To carry its burden, the plaintiff must "establish[] sufficient factual matter to plausibly demonstrate his standing to bring the action."  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).  "Neither conclusory assertions nor unfounded speculation can supply the necessary heft."  *Id.*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Lemos v. Bank of America*, 132 F. Supp. 3d 261, 263 (D. Mass. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "'[F]actual allegations' must be separated from 'conclusory statements in order to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for relief.'"  *Id.* (quoting *Juarez v. Select Portfolio*

5

*Servicing, Inc.*, 708 F.3d 269, 276 (1st Cir. 2013)) (alteration in original).  A court need not "accept every allegation made by the complainant, no matter how conclusory or generalized." *Id.* (quoting *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992)) (internal quotation marks omitted). "Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *Id.* (quoting *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997)).

## ARGUMENT

### I.      Plaintiffs Lack Article III Standing

To invoke the jurisdiction of the federal courts, a plaintiff must establish Article III standing. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 408 (2013).  To do that, a plaintiff must "clearly . . . allege facts demonstrating" the three elements that constitute the "irreducible constitutional minimum of standing." *Warth v. Seldin*, 422 U.S. 490, 518 (1975); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Specifically, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Because FASORP and CMU are organizations, as opposed to individuals, they must establish at least three additional elements to have Article III standing.[4]  *First*, their members must

---

[4] A plaintiff organization also can try to establish that it has "organizational standing"— that is, that it would have standing in its own right. *See, e.g.*, *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324–25 (D. Mass. 2013); *see also, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  But Plaintiffs are not pursuing this standing theory.  Neither FASORP nor CMU alleges any *institutional* injury separate and apart from its members' alleged injuries.  *Cf.* Am. Compl. ¶¶ 26–27 (quoting the requirements for *associational* standing).

have standing to sue in their own right. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). *Second*, the interests the associations seek to protect through the litigation must be "germane to [their] purpose." *Id.* *Third*, "neither the claim asserted nor the relief requested [should] require[] the participation of individual members in the lawsuit." *Id.* *See generally United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992).

"The party invoking federal jurisdiction bears the burden" of establishing all of these elements. *Lujan*, 504 U.S. at 561. Plaintiffs have not carried that burden. As a result, this Court lacks subject-matter jurisdiction.

Most obviously, neither FASORP nor CMU has shown that any of its members have standing to sue. The Supreme Court, the First Circuit, and at least six other federal courts of appeals have made clear that an association cannot satisfy this first prong of the *Hunt* test without *specifically identifying* at least one member who would have standing to sue in his or her own right. *See, e.g.*, *Summers*, 555 U.S. at 498 (a plaintiff-organization cannot establish standing without "mak[ing] specific allegations establishing that at least one *identified* member had suffered or would suffer harm" (emphasis added)); *Draper*, 827 F.3d at 3 (to have associational standing, an organization must, "at the very least," "*name*[] an injured individual" (emphasis added)).[5] And for good reason. Without that information, "how is the court to assure itself" that an association truly has any members, or confirm that any one of those members "meet[s] all of the[] criteria" necessary to have standing? *Summers*, 555 U.S. at 499. It cannot.

---

[5] *See also e.g.*, *Georgia Republican Party v. SEC*, 888 F.3d 1198, 1203–05 (11th Cir. 2018); *Ouachita Watch League v. U.S. Forest Service*, 858 F.3d 539, 543–44 (8th Cir. 2017); *Tennessee Republican Party v. SEC*, 863 F.3d 507, 520–21 (6th Cir. 2017); *Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 242, 244–46 (D.C. Cir. 2015); *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *Associated Gen. Contractors of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

HLRA explained this straightforward requirement in its initial motion to dismiss, and yet Plaintiffs' Amended Complaint remains deficient.  Plaintiffs again insist that their membership includes injured individuals, but they do not identify a single one.  This omission forecloses this Court from exercising jurisdiction.

To be sure, Plaintiffs' Amended Complaint does include three new paragraphs, which allege that the organizations' membership includes "[a]t least one" prospective *Law Review* editor and "[a]t least one" prospective *Law Review* author.  Am. Compl. ¶¶ 38-40.  But these vague allegations are plainly insufficient.[6]  Under the binding precedent set forth above, this Court may not simply take Plaintiffs at their word regarding their membership.  Instead, the First Circuit

---

[6] Even if Plaintiffs' vague allegations about their membership were sufficient, Plaintiffs conspicuously fail to allege that their membership includes "[a]t least one" current *Law Review* editor, HLRA alumnus, or author who has participated in the *Law Review*'s editorial process.  Plaintiffs therefore may not rely on several of the "injuries" included in their Amended Complaint.  *See, e.g.*, Am. Compl. ¶ 31 (alleging that "[t]hose [authors] who have their articles accepted by the journal must submit to a student-run editing process" whose quality is "dilute[d]" by HLRA's "use of race and sex preferences"); *id.* ¶ 32 (alleging that HLRA's "race and sex preferences . . . diminish the prestige of the law-review credential" for alumni editors); *id.* ¶ 33 (alleging that female and minority alumni of the *Law Review* "suffer an additional 'injury in fact' because their law-review membership is now viewed with suspicion").

Moreover, even if Plaintiffs had identified "[a]t least one" member of each of these groups, they could not assert claims on their behalf.  The private right of action under Titles VI and IX extends only to those who have been discriminated against, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 713 (1979); yet many of the allegedly injured individuals described in the Amended Complaint do not themselves claim to have suffered discrimination based on their race or sex.  *See, e.g.*, Am. Compl. ¶ 31 (alleging that authors whose articles are accepted are injured—not by themselves suffering discrimination, but by having to endure less qualified editors who joined the *Law Review* instead of other students who suffered discrimination).  This disconnect between the injuries alleged and the victims of the alleged discrimination gives rise to a zone-of-interests and third-party standing problem that requires the dismissal of any claims brought on behalf of individuals who do not themselves claim to have suffered discrimination.  *See United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).

requires them to "name[] an injured individual" before they can proceed past the pleading stage and into discovery. *E.g.*, *Draper*, 827 F.3d at 3 ("[W]hy the advocacy group would have needed formal discovery to identify which of its own members may have been injured . . . is a mystery the group leaves unsolved.").[7]

## II.    Plaintiffs Fail To State a Claim Upon Which Relief Can Be Granted

In addition to this jurisdictional problem, Plaintiffs' Amended Complaint is deficient on the merits. Title VI and Title IX apply only to discrimination on the basis of race (Title VI) or sex (Title IX) in a "program or activity receiving Federal financial assistance." *See* 20 U.S.C. § 1681; 42 U.S.C. § 2000d. To survive a 12(b)(6) motion, then, Plaintiffs must adequately allege one of two theories: (1) HLRA is a federal funding recipient that discriminates on the basis of race or sex, or (2) HLRA (or the *Law Review*) discriminates on the basis of race or sex and is a "program or activity" of Harvard University, itself a federal funding recipient. But Plaintiffs' Amended Complaint fails to adequately allege either one of these theories. *First*, Plaintiffs do not adequately allege that HLRA receives federal financial assistance. On that basis alone, HLRA is not subject

---

[7] Not only do Plaintiffs lack associational standing, many of the injuries that they allege are also deficient as a matter of law *and* under the *Iqbal/Twombly* pleading standard. To satisfy the requirements of Article III, an alleged injury may not be "conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted). Yet several of Plaintiffs' alleged injuries are precisely that. The "injuries" set forth in paragraphs 30 through 33 of the complaint rely on the wholly conjectural speculation that students who are selected through holistic review are inherently "less capable" editors than students who are selected based on their law school grades or their performance in the writing competition. Similarly, the "injuries" set forth in paragraph 35 hinge entirely on the hypothetical acceptance of Plaintiffs' members as *Law Review* editors. Equally problematic, several of Plaintiffs' alleged injuries cannot be redressed by the *prospective* injunctive relief it seeks. *See, e.g.*, Am. Compl. ¶ 32 (alleging that alumni suffer from diminished prestige because holistic review has tarnished the reputation of the *Law Review*); *id.* ¶ 33 (alleging that the inability to prove that they earned a position on the *Law Review* through their grades or their writing-competition scores, as opposed to through holistic review, injures female and minority alumni's credentials); *Spokeo*, 136 S. Ct. at 1547 (affirming redressability requirement).

to suit under Title VI or Title IX and must be dismissed as a defendant. *Second*, Plaintiffs do not adequately allege that the *Law Review* constitutes a "program or activity" of Harvard such that its conduct may be attributed to the University under the statutes. Nor do they adequately allege conduct that constitutes discrimination under Title VI or Title IX. The Amended Complaint thus must be dismissed.

### A. Plaintiffs Have Not Adequately Alleged That HLRA Receives Federal Funding

Both Title VI and Title IX expressly limit their coverage to "program[s] or activit[ies] *receiving Federal financial assistance*." 42 U.S.C. § 2000d (emphasis added); 20 U.S.C. § 1681(a) (emphasis added). This limitation makes sense: In essence, Titles VI and IX establish a *quid pro quo*, in which a recipient agrees to abide by certain non-discrimination requirements in exchange for receiving federal funding. *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605–06 (1986) ("Under the program-specific statutes, Title VI, Title IX, and § 504, Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision."). Naturally, only those entities that have actually received federal funding in exchange for promising to abide by the statutes' non-discrimination requirements can be sued for breaking that promise. *See id.*

Although Plaintiffs originally said nothing about whether HLRA receives federal funding, they have since revised their complaint to include a conclusory allegation that it does. Am. Compl. ¶ 49 ("The Harvard Law Review is a 'program or activity' that 'receives Federal financial assistance' within the meaning of Title VI and Title IX."). But this new allegation is little improvement over Plaintiffs' initial silence. Plaintiffs say nothing that specifies the source or kind of "Federal financial assistance" they insist HLRA receives. And they certainly do not provide any factual support for the idea that HLRA receives any of the types of "federal financial assistance" that must be shown under the relevant regulations. *See* 28 C.F.R. § 42.102(c) (defining

the term to include "(1) Grants and loans of Federal funds, (2) The grant or donation of Federal property . . . , (3) The detail of Federal personnel, (4) The sale and lease of, and the permission to use . . . Federal property . . . , and (5) Any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance").  Instead, Plaintiffs' new allegation is precisely the kind of "[t]hreadbare recital[] of the elements of a cause of action" that "do[es] not suffice" after *Iqbal*.  *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

Later in the Amended Complaint, Plaintiffs allege that some "student members of the Harvard Law Review receive federal financial assistance to pay their law-school tuition." Am. Compl. ¶ 50.  But Plaintiffs do not allege that HLRA itself actually receives any of those federal tuition funds.  The student editors' alleged financial assistance is, accordingly, irrelevant and cannot bring HLRA within the ambit of Title VI or IX.  *See NCAA v. Smith*, 525 U.S. 459, 468 (1999) (holding that Title IX covers entities that actually receive federal funds directly or indirectly, but not entities that merely benefit in some way from federal funding); *see also U.S. Paralyzed Veterans of Am.*, 477 U.S. at 607 (interpreting § 504 of the Rehabilitation Act of 1973 in the same way).

### B.   Plaintiffs Have Not Adequately Alleged That HLRA Is a "Program or Activity" of Harvard University

Perhaps because they cannot successfully allege that HLRA itself is a federal funding recipient, Plaintiffs now assert that HLRA is covered by Titles VI and IX as a "program or activity" of Harvard University, which is a federal funding recipient.  Am. Compl. ¶ 49.  As an initial matter, even if this conclusory legal allegation were true—that is, even if HLRA were indeed a "program or activity" of Harvard University—that proposition would not support naming HLRA as a defendant.  Courts have uniformly held that Titles VI and IX afford a cause of action only against

the recipient of federal funding itself because, as explained above, that entity alone is a party to the *quid pro quo* arrangement that gives the federal anti-discrimination statutes their force. *See supra* Part II.A; *e.g.*, *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) (Title IX's right of action "extends only to claims against the educational institution itself"); *Shotz v. City of Plantation*, 344 F.3d 1161, 1170–71 (11th Cir. 2003) ("Title VI . . . precludes liability against those who do not receive federal funding.").[8]  For that reason, HLRA is not a proper defendant under any circumstances.

In any event, Plaintiffs have not adequately alleged that HLRA is a "program or activity" of Harvard University.  Under Titles VI and IX, a "program or activity" is defined to mean, as relevant here, "all of the operations of . . . a college, university, or other postsecondary institution." 20 U.S.C. § 1687(2)(A); 42 U.S.C. § 2000d-4a(2)(A).  In other words, to qualify as a "program or activity," HLRA must be an "operation[] of" Harvard University.  *Id.*  Plaintiffs' Amended Complaint establishes nothing of the sort.

Though case law exploring what it means to be an "operation[]" of an educational institution is sparse, the plain meaning of the word itself provides one obvious limiting principle: to be an "operation[]" of Harvard University, HLRA must be *operated*—or controlled—by Harvard University.  *See, e.g.*, 34 C.F.R. § 106.11 (Title IX regulations apply to "the education program or activity *operated by* [the] recipient which receives Federal financial assistance" (emphasis added)); *see also, e.g.*, Oxford English Dictionary (2015) (defining "operate" as "to

---

[8] *See also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) (declining to extend Title IX liability beyond the scope of "the Government's enforcement power," which "may only be exercised against the funding recipient"); *NCAA*, 525 U.S. at 467 n. 5 (rejecting suggestion "that the private right of action available under [Title IX] is potentially broader than the Government's enforcement authority"); *Cannon*, 441 U.S. at 678 ("Title IX was patterned after Title VI . . . , and the drafters of Title IX explicitly assumed that it would be interpreted and enforced in the same manner").

manage or direct"); Collins Dictionary (2010) ("to control the functioning of" or "to manage, direct, run, or pursue"); *Lam v. Curators of the Univ. of Missouri at Kansas City Dental Sch.*, 122 F.3d 654, 656 (8th Cir. 1997) (noting that the "program[s] or activit[ies]" listed as examples in Title IX's legislative history are all "*controlled by* and inure some benefit to the institution" (emphasis added)).  Not only is that reading of "operation[]" compelled by the word's plain meaning, it is also the only reading that makes sense given the *quid pro quo* that Titles VI and IX envision:  An educational institution can only promise to prevent discrimination by "program[s] or activit[ies]" over which it exercises control.

Plaintiffs, however, have not alleged any facts that would support the conclusion that Harvard University "operat[es]" HLRA.  Indeed, as mentioned above, their own Exhibit states that HLRA is "formally independent" of the University.[9]  Ex. 1 at 1.  And HLRA's official corporate records confirm this alleged independence.  *See* Secretary of Commonwealth, Corporations Division, *Business Entity Summary: The Harvard Law Review Association*, http://corp.sec.state. ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?FEIN=042104292&SEARCH_TYPE=1   (last visited Feb. 25, 2019) (summary of the Harvard Law Review Association's corporate filings with the Commonwealth of Massachusetts); *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993) (noting that consideration of "official public records" on a motion to dismiss is appropriate and does not convert the motion into one for summary judgment).  According to Plaintiffs' own pleading and

---

[9] Where, as here, written instruments are provided as exhibits to a pleading, the exhibit "is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c); *see also Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).  Indeed, when "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  *Trans-Spec Truck Serv.*, 524 F.3d at 321 (citation omitted).  Moreover, when "a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."  *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (citation omitted).

the "official public records" of the Commonwealth of Massachusetts, then, HLRA is not an "operation[]"—and, thus, not a "program or activity"—of Harvard University.

Plaintiffs have tried to compensate for their inability to allege operative control by adding allegations that highlight that HLRA and Harvard University are not wholly unrelated. *See* Am. Compl. ¶ 50. Nevertheless, the connection these allegations draw between HLRA and Harvard University cannot overcome HLRA's independence and establish that either it or its publication, the *Law Review*, is an "operation[] of" the University. For instance, Plaintiffs allege that enrollment at Harvard Law School is a prerequisite to being selected as a *Law Review* editor. *Id.* But HLRA's voluntary and unilateral decision to select only Harvard Law School students as the *Law Review*'s editors in no way transforms HLRA into an "operation" of the University. *Id.* Plaintiffs do not allege that the University mandated this policy, nor do they allege that the University could stand in the way if HLRA decided to welcome editors from outside the Harvard student body. After all, if a Boston law firm hired exclusively Harvard Law School graduates, would that hiring practice render the law firm an "operation[] of" the law school? Certainly not. Plaintiffs' allegation about HLRA's independently chosen applicant pool is similarly inconsequential.

Plaintiffs also allege various ways that HLRA interacts with the University. *See id.* But these allegations do not address the question of whether Harvard University *operates* HLRA within the meaning of the statute. Indeed, the Supreme Court has made pellucid that the mere acceptance of benefits from a federal funding recipient does not subject an entity to Titles VI and IX. *See NCAA*, 525 U.S. at 468. It does not matter whether Harvard University helps HLRA obtain its prospective editors' first-year grades, permits faculty to "assist and advise" HLRA, or permits HLRA to use space on campus. Am. Compl. ¶ 50. What matters under the law is whether the

University manages or controls HLRA—and none of these allegations state, or even support an inference, that it does.

Finally, Plaintiffs allege that HLRA is "subject to rules and regulations that the Law School or University chooses to establish."  *Id*.  They do not identify any examples of "rules and regulations" that bind HLRA, nor do they attempt to reconcile this assertion with their exhibit stating both that the *Law Review* is "independent" of Harvard and that its "editors make all editorial and organizational decisions."  Ex. 1 at 1.  Even taking the conclusory allegation as true, moreover, the existence of rules and regulations that apply generally across the University in no way indicates that Harvard "control[s] the functioning of," "manage[s], direct[s], [or] "run[s]" HLRA.  Such rules thus cannot render HLRA an "operation" of the University.

In short, Plaintiffs have not alleged a single fact from which one could conclude that the University actually controls, manages, funds, or in any other manner "operates" HLRA.

**C.      Plaintiffs Have Not Advanced a Cognizable Claim That HLRA Discriminates on the Basis of Race or Sex**

Finally, Plaintiffs fail to adequately allege that HLRA's editor- or article-selection policies amount to illegal discrimination or exclusion under Title VI or Title IX.

First, with respect to article selection, Plaintiffs include only the solitary allegation that HLRA "giv[es] preferential treatment to articles written by women or racial minorities."  Am. Compl. ¶ 19.  Plaintiffs provide no factual basis whatsoever for this speculative theory; they do not define "preferential treatment"; they give no indication as to how they believe this so-called preferential treatment operates—or how it, in turn, violates the law; and they have not identified a single article or author that has been refused publication as a result of this alleged preference.  This threadbare allegation cannot satisfy the pleading standard set forth in *Iqbal*, so all of Plaintiffs' claims involving article selection must be dismissed.  *See* 556 U.S. at 687.

As for editor selection, Plaintiffs' assertion that HLRA considers race and sex as part of its selection processes does not allege actionable discrimination under Titles VI and IX. Decades ago, the First Circuit stated, in no uncertain terms, that those statutes "*permit[]* affirmative action." *Cohen*, 101 F.3d at 170; *id.* at 170 n.11 ("Title IX itself specifies only that the statute shall not be interpreted to *require* gender-based preferential or disparate treatment. . . . [A]lthough Congress could easily have done so, it did not ban affirmative action . . . under Title IX."); *cf.* 34 C.F.R. § 106.3(b) ("[A] recipient may take affirmative action to overcome the effects of conditions which resulted in limited participation therein by persons of a particular sex."). And the Supreme Court has blessed a range of affirmative-action programs in suits that included statutory anti-discrimination claims.[10] *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) (opinion of Powell, J.). Together, these cases indicate that a plaintiff may not survive a motion to dismiss simply by alleging that an organization has sought to expand opportunities for underrepresented groups like women or minorities by using holistic race- and sex-conscious policies. Yet that is essentially all Plaintiffs have alleged. Am. Compl. ¶ 13; Ex. 3.

---

[10] The Supreme Court has not yet clarified whether the restrictions imposed by the Equal Protection Clause and Titles VI and IX are coextensive. Nor has it expressly extended the holdings from its affirmative-action precedents from the public-university context to the private sector. The Court has, however, squarely rejected the view that the anti-discrimination statutes impose a *more* stringent restriction on affirmative-action policies than the Constitution. *See Grutter*, 539 U.S. at 343 ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause." (quoting *Bakke*, 438 U.S. at 287 (opinion of Powell, J.)); *Bakke*, 438 U.S. at 284 (Title VI did not "enact[] a purely color-blind scheme"). And, given the remedial nature of Titles VI and IX, there is good reason to think that those statutes afford organizations even greater latitude as far as the diversity policies they can choose to employ. The same is true of HLRA's private status and its role as a publisher of important legal scholarship: those considerations only *bolster* the organization's case for broader leeway in exercising its discretion to pursue its compelling First Amendment interests. *Cf. Bakke*, 438 U.S. at 312–13 (indicating that academic freedom is a "special concern of the First Amendment").

Moreover, the meager factual allegations in Plaintiffs' Amended Complaint only further align HLRA's diversity policies with the policies the Supreme Court has previously approved. *First*, those cases have specifically endorsed holistic review—that is, a "contextual" consideration of race or sex that does not involve a "mechanical plus factor for underrepresented minorities." *Fisher II*, 136 S. Ct. at 2207.   HLRA's editor-selection policy, as set forth in the Amended Complaint and the incorporated exhibits, plainly contemplates precisely that approach.  Plaintiffs acknowledge this.  Their Amended Complaint alleges that HLRA engages in "holistic" review and considers race and sex contextually.   Am. Compl. ¶¶ 15–18.   According to Plaintiffs' own allegations, HLRA selects eighteen editors through a comprehensive review process "that takes into account all available information." *Id.* ¶ 16.  Review of applicants is based on their first-year grades and their competition scores, as well as information that the applicants choose to provide regarding their racial or ethnic identity, physical disability status, gender identity, sexual orientation, socioeconomic status, and other aspects of their identity or background. *Id.* ¶¶ 16–18. Thus, taking Plaintiffs' allegations as true, race and sex are but one potential factor out of a wide range of factors that are considered during editor selection. *See id.*  This is *exactly* the type of holistic consideration that the Supreme Court has repeatedly deemed permissible.

*Second*, the Supreme Court has stressed that organizations are not to "impose a fixed quota." *Fisher II*, 136 S. Ct. at 2208.  Plaintiffs do assert in one paragraph of their Amended Complaint that HLRA has a "fixed, numerical set-aside of 18 slots reserved for 'diversity' candidates."   Am. Compl. ¶ 53.  But insofar as Plaintiffs' scare quotes mean to suggest that those eighteen slots can be filled only by applicants of a certain race or sex, that conclusory assertion directly conflicts with the Amended Complaint's more detailed description of HLRA's process. In those paragraphs, the Amended Complaint makes clear that *all applicants* to HLRA, regardless

of race or sex, are eligible for *all forty-eight editor positions*, including the eighteen positions selected through the holistic-review process. *Id.* ¶¶ 16-18. Such a policy is not a "quota," as the Supreme Court has defined it. According to the Court, "properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Grutter*, 539 U.S. at 334 (citation omitted). Even according to Plaintiffs' own description, HLRA's policy does not function in that manner. Plaintiffs' conclusory labeling of HLRA's policy as a "quota" is therefore irrelevant.[11] *Iqbal*, 556 U.S. at 679 ("[Courts] are not bound to accept as true a legal conclusion couched as a factual allegation." (citation omitted)).

Taking all of the allegations in Plaintiffs' Amended Complaint as true, Plaintiffs have simply alleged that HLRA approaches editor selection in a manner that is virtually identical to the way the public universities approached admissions in *Bakke*, *Grutter*, and *Fisher*. Without more, there is simply no reason to permit this suit to proceed past the pleadings stage and into discovery.

\*　　　\*　　　\*

Following Defendants' initial motions to dismiss, Plaintiffs were on notice of the many deficiencies with the merits of their claims. Yet those deficiencies are still present, even after Plaintiffs amended their complaint. There is no reason to think permitting Plaintiffs to continue amending their complaint will lead to better results. The Court should accordingly dismiss Plaintiffs' claims with prejudice and deny them leave to amend their complaint another time. *Ezell*,

---

[11] To the extent that Plaintiffs mean to imply that HLRA's holistic-review process operates differently in practice than the way they describe in their Amended Complaint, Plaintiffs provide no factual basis for that suggestion. *See* Am. Compl. ¶ 18 (calling HLRA's editor-selection process "*purportedly* 'holistic'" (emphasis added)). This type of vague, speculative allegation cannot survive scrutiny. *Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown . . . that the pleader is entitled to relief." (alterations and citations omitted)).

335 F. Supp. 3d at 97 n.1 ("If the amended complaint is deficient, dismissal will be with prejudice."); *Segelman v. City of Springfield*, 561 F. Supp. 2d 123, 125 (D. Mass. 2008) ("A ruling allowing a Motion to Dismiss for failure to state a claim is presumed to be with prejudice . . . [p]articularly where, as here, Plaintiff has had an opportunity to review and amend the complaint, and where its contents still cannot withstand analysis . . . .").[12]

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.

Dated:  February 28, 2019

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr. (*pro hac vice*)
Chad I. Golder (*pro hac vice*)
Sarah G. Boyce (*pro hac vice*)
Dahlia Mignouna (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
1155 F Street N.W., Seventh Floor
Washington, DC 20004-1357
(202) 220-1100

Ryan P. McManus
M. Patrick Moore
HEMENWAY & BARNES
75 State Street
Boston, MA 02109
(617) 557-9705

*Attorneys for Defendant*
*Harvard Law Review Association*

---

[12] *See also United States ex. rel. Gagne v. City of Worcester*, 565 F.3d 40, 48 (1st Cir. 2009) ("Reasons for denying leave include . . . repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility."); *ACA Fin. Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008) ("[P]laintiffs do not get leisurely repeated bites at the apple.").