UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil No. 18-12105-LTS |
| HARVARD LAW REVIEW ASSOCIATION et al., | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON DEFENDANTS' MOTIONS TO DISMISS (Doc. Nos. 42, 44, and 46)

August 8, 2019

SOROKIN, J.

The plaintiffs allege that Harvard's Law School ("HLS") and Law Review Association ("HLRA") violate Titles VI and IX by using race and sex preferences when selecting student members of HLRA, choosing articles for publication by HLRA, and hiring HLS faculty. They also allege that the United States government, through the Department of Education and its Secretary, enable this alleged discrimination by incorrectly interpreting the relevant statutes as permitting the use of race and sex preferences, and by continuing to provide federal funding to Harvard. The defendants have moved to dismiss the action for lack of standing and failure to state a claim. For the reasons that follow, the defendants' motions are ALLOWED.

I.      BACKGROUND

The Court recounts the facts as they are alleged in the Amended Complaint and reflected in the exhibits attached to it.

   A.      The Parties

The plaintiffs are two "unincorporated nonprofit membership association[s] organized under the laws of Texas."[1]  Doc. No. 33 ¶¶ 3-4.  They "seek to restore meritocracy at American universities by eliminating the use of race and sex preferences."  Id. ¶ 36.  Each plaintiff association has: "[a]t least one member" who is a "current student[] at [HLS] who intend[s] to apply for membership on [HLRA]," id. ¶ 38; "[a]t least one member" who is a "faculty member[] or legal scholar[] who ha[s] submitted articles to [HLRA] in the past, and who intend[s] to continue submitting their scholarship to [HLRA] in the future," id. ¶¶ 39-40; and "[a]t least one member" who has "sought and applied for entry-level or lateral teaching positions at [HLS] and intend[s] to do so again in the future," or who remains a "potential candidate[] for visiting professorships and lateral faculty appointments without any need to formally apply," id. ¶ 42.

The record contains no other facts about the associations, how they operate, or any of their members.

The defendants are HLRA, the President and Fellows of Harvard College ("Harvard"), and United States Secretary of Education Elisabeth DeVos (who is sued in her official capacity).[2]  Doc. No. 33 ¶¶ 5-7.  HLRA publishes the Harvard Law Review, "an academic

---

[1] The two associations are: Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP"); and Coalition for Meritocracy at Universities ("CMU").
[2] Although the Amended Complaint also named the United States as a defendant, Doc. No. 33 ¶ 8, the plaintiffs have now conceded that their only claim against the United States is time-barred.  See Tr. Mot. Hr'g at 35-36, 80, Faculty, Alumni, & Students Opposed to Racial Preferences v. Harvard Law Review, No. 18-cv-12105-LTS (D. Mass. June 20, 2019) (on file

journal edited and operated by students at [HLS]." Id. ¶ 9. The plaintiffs allege that HLRA "receives Federal financial assistance" because its members receive federal financial aid to pay their tuition, and because it "draws upon" the resources of HLS and Harvard. Id. ¶¶ 49-50. Alternatively, they allege that HLRA is "a 'program or activity' of [HLS] and Harvard," and that HLS and Harvard receive "Federal financial assistance." Id. ¶ 49. In particular, the plaintiffs assert that HLRA members must be enrolled at HLS, that HLRA relies on HLS to provide applicants' first-year grades, that HLRA is subject to rules and regulations HLS and Harvard establish for student organizations, that HLS faculty "assist and advise" HLRA, and that HLRA occupies space on Harvard's campus. Id. ¶ 50.

B. The Allegations

HLRA "is a student-run organization" that "is formally independent of [HLS]." Doc. No. 33-1 at 1.[3] Student members "make all editorial and organizational decisions," id., including choosing articles and selecting HLRA members and editors, Doc. No. 33 ¶ 9. At one time, HLRA membership was based on first-year grades and performance in a writing competition, making it "an academic honor." Id. ¶ 10. About twenty-five years ago, HLRA adopted a race-based affirmative action policy as part of its membership selection process. Id. ¶¶ 11-12; Doc. No. 33-2 at 1. In 2013, it expanded the affirmative action policy to consider gender, along with race and physical disabilities, when selecting a certain number of new members. Doc. No. 33 ¶ 13; Doc. No. 33-3.

---

with the Court) [hereinafter "Tr. Mot. Hr'g"] (showing that although the plaintiffs ignored the federal defendants' statute-of-limitations argument when opposing the pending motions, they accepted at the motion hearing that the APA claim "was not going to work"). In light of that concession, the United States is DISMISSED as a party to this action.

[3] Citations to items appearing on the Court's electronic docket ("Doc. No. __ at __") reference the document and page numbers appearing in the ECF header.

HLRA's current process for selecting its members operates in three stages as follows. Each year, forty-eight students are invited to join HLRA. Doc. No. 33 ¶ 15; Doc. No. 33-1 at 6. All students wishing to be considered for HLRA membership must complete a writing competition at the end of their first year in law school. Doc. No. 33-1 at 5. Twenty students are selected for HLRA "based solely on their [writing] competition scores." Id. at 6; Doc. No. 33 ¶ 15. Ten students are chosen "based on an equally weighted combination of [writing] competition scores and [first-year] grades"—one from each of seven first-year sections, and three others without regard to section. Doc. No. 33-1 at 6; Doc. No. 33 ¶ 15. According to the plaintiffs, the thirty students invited to join HLRA in these two phases of its process are "selected on the basis of merit." Doc. No. 33 ¶ 16.

The plaintiffs' claims in this action center on the remaining eighteen positions, which are filled "through a holistic but anonymous review that takes into account all available information." Doc. No. 33-1 at 6; Doc. No. 33 ¶ 16. At this stage, HLRA considers information applicants choose to share regarding "their racial or ethnic identity, physical disability status, gender identity, sexual orientation, and socioeconomic status." Doc. No. 33-1 at 6. Applicants also may submit a brief "expository statement . . . that identifies and describes aspects of their background not fully captured by the categories" listed above. Id. Such statements "remain anonymous" and are considered by HLRA "*only* after grading" of the writing competition. Id. (emphasis in original). In describing the member-selection process, HLRA notes its "strong[] commit[ment] to a diverse and inclusive membership." Id.; Doc. No. 33 ¶ 16.

HLS forbids student organizations from "discriminat[ing] against any person on the basis of race, color, . . . national or ethnic origin, . . . sex, gender identity, sexual orientation, [or] disability," among other characteristics. Doc. No. 33 ¶¶ 20-21. The plaintiffs allege that HLRA

4

violates that policy by using the "holistic" component of its member-selection process to permit "women, 'underrepresented' racial minorities, homosexuals, and transgendered people . . . to leapfrog candidates with better grades or better scores on the writing competition." Id. ¶ 18. The plaintiffs further contend that HLRA impermissibly "discriminates on account of race and sex when selecting articles for publication, by giving preferential treatment to articles written by women or racial minorities." Id. ¶ 19. Also, the plaintiffs assert that HLS "discriminates on account of race and sex when hiring its faculty, by discriminating in favor of female or minority faculty candidates and against white men." Id. ¶ 23.

The plaintiffs claim their members suffer various "injuries in fact" as a result of the challenged practices. Members who are "white or male" faculty members or legal scholars who submit articles to HLRA allegedly face race and sex discrimination in HLRA's article-selection process. Id. ¶ 29. Members who are faculty members or legal scholars who submit articles to HLRA, irrespective of their race and gender, allegedly have their work judged and edited "by less capable students." Id. ¶¶ 30-31. Members who are HLRA alumni,[4] irrespective of their race and gender, allegedly suffer "diminish[ed] . . . prestige of the[ir] law-review credential," which the plaintiffs claim "no longer acts as a reliable signaling device for academic ability or achievement." Id. ¶ 32. Members who are female or minority HLRA alumni allegedly have "their law-review membership . . . viewed with suspicion—and it is difficult or impossible for them to prove that they earned" the credential "because of academic merit rather than" through "diversity set-asides." Id. ¶ 33. Members who are current HLS students allegedly "will be denied an equal opportunity to compete for [HLRA] membership . . . on account of their race, sex, sexual orientation, or gender identity." Id. ¶ 34. And, finally, members who are female or

---

[4] The Amended Complaint does not allege the plaintiffs have as members any HLRA alumni.

minority students at HLS "and who would have earned their way on to [HLRA] without help from the Diversity Committee" will have their credentials "tainted by the journal's diversity set-asides." Id. ¶ 35.

The plaintiffs assert that Supreme Court decisions considering racial preferences used in public-university admissions do not apply to private universities, to faculty hiring, or to the selection of members and articles for student-run journals. Id. ¶ 52. In addition, they claim HLRA's process amounts to a "fixed, numerical set-aside of 18 slots reserved for 'diversity' candidates," that HLRA "failed to adequately consider race- and sex-neutral alternatives," and that HLRA's "race and sex preferences are not limited in time." Id. ¶¶ 53-55.

The Department of Education interprets Titles VI and IX "to permit universities to discriminate in favor of" women and racial minorities, "and against men" and "whites," "whenever" women or racial minorities "are underrepresented relative to their numbers in the general population—regardless of whether the alleged underrepresentation was caused by previous" sex or racial "discrimination." Id. ¶¶ 24-25. According to the plaintiffs, this interpretation is at odds with the language of the statutes, and it enables HLRA and Harvard "to engage in race and sex discrimination" by allowing them to receive federal funding despite the allegedly discriminatory practices. Id. ¶¶ 43-44.

C.   Procedural History

FASORP filed the original complaint in this action in October 2018. Doc. No. 1. In it, FASORP asserted claims under Titles VI and IX against HLRA, HLS, and Harvard for using race and sex preferences to select HLRA members and for engaging in race and sex discrimination when selecting articles for publication by HLRA. Id. at 1. It also asserted a claim against DeVos under the Administrative Procedure Act ("APA") for continuing to provide

federal funding to the defendants despite their alleged use of such preferences and discrimination.  Id. ¶¶ 36-37.

The defendants moved to dismiss the original complaint, arguing FASORP had not alleged sufficient facts to plausibly state a claim or to establish associational standing.  Doc. Nos. 23, 24, 29.  FASORP responded to the motions by amending its complaint in January 2019.  Doc. No. 33.  The Amended Complaint added CMU as a plaintiff, eliminated HLS as a defendant, added a claim against Harvard for race and sex discrimination in hiring HLS faculty, and supplemented the plaintiffs' "standing" allegations.  Compare generally Doc. No. 1, with Doc. No. 33.

The Amended Complaint requests the following relief:  a) a declaration that HLRA's member- and article-selection policies violate Titles VI and IX; b) a permanent injunction barring HLRA "from considering race, sex, sexual orientation, or gender identity when selecting its members, editors, or articles"; c) a permanent injunction barring HLRA "from soliciting information about an applicant's or author's race, sex, sexual orientation, or gender identity"; d) an order requiring HLRA "to establish a new membership-selection policy that is based entirely on academic merit and that explicitly disavows any consideration of race, sex, sexual orientation, or gender identity or expression," and to submit its new policy to the Court and DeVos for review and approval; e) a permanent injunction barring HLRA "from selecting any new members or editors without first securing preclearance" from the Court and DeVos, "each of whom must certify that [HLRA's] selection of those new members and editors was based on academic merit and was not in any way affected or influenced by race, sex, sexual orientation, or gender identity"; f) an order requiring HLRA "to establish a new article-selection policy that explicitly forbids any consideration of an author's race, sex, sexual orientation, or gender identity

or expression," along with a "process that conceals" such characteristics "and all other information that could be used to identify the author before the article is selected for publication," and to submit its new process to the Court and DeVos for review and approval; g) an order requiring DeVos "to terminate federal funding to all components of Harvard University until [HLRA] renounces its use of race and sex preferences when selecting its members, editors, and articles"; h) an order invalidating two specific regulations "and any other agency rule, order, action, or guidance document that purports to allow universities to use race or sex preferences in faculty hiring, or that purports to allow law reviews to use race or sex preferences when selecting members or articles"; i) costs and attorneys' fees; and j) any other relief the Court deems appropriate.  Doc. No. 33 ¶ 59.

The defendants renewed their motions to dismiss, urging that the plaintiffs had not cured the pleading and standing deficiencies that had plagued the original complaint.  Doc. Nos. 42, 44, 46.  The plaintiffs opposed the motions, Doc. Nos. 49, 50, 51, and the defendants replied, Doc. Nos. 56, 57, 58.  The Court heard oral argument on June 20, 2019.  Doc. No. 62.

II.     LEGAL STANDARDS

    A.     Pleading

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must provide fair notice to the defendants and state a facially plausible legal claim."  Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  The pleader must "'show' an entitlement to relief" by including in the complaint "enough factual material 'to raise a right to relief above the speculative level'" if the facts alleged are accepted as true.  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)); accord Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Fed.

R. Civ. P. 8(a). In assessing whether a complaint withstands a Rule 12(b)(6) challenge, courts "employ a two-pronged approach." Ocasio-Hernandez, 640 F.3d at 12.

First, statements in the complaint that amount to "threadbare recitals of the elements of a cause of action" are identified and disregarded. Id. (quotation marks and brackets omitted). So, too, are "bald assertions, subjective characterizations and legal conclusions." DM Research, Inc. v. Coll. Of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (quotation marks omitted). As the First Circuit has warned, such statements "are a danger sign that the plaintiff is engaged in a fishing expedition." Id. "[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." Id. (emphasis in original).

Second, "[n]on-conclusory factual allegations" are "treated as true, even if seemingly incredible." Id. If such allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and thereby "state a plausible, not a merely conceivable, case for relief," then the motion to dismiss must be denied. Id. (quotation marks omitted); accord Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (citation omitted).[5]

---

[5] The plaintiffs have urged the Court to apply a different standard, insisting that "conclusory pleading is entirely acceptable in federal court," Doc. No. 51 at 6, and citing Form 11 to the Federal Rules of Civil Procedure in support of the astonishing proposition that a one-sentence complaint identifying only the date and location a civil claim arose should survive a motion to dismiss, id. at 7; Tr. Mot. Hr'g at 31, 49, 63, 77. They zealously adhered to this view even after Harvard pointed out, on the very first page of its reply brief, that Form 11 was "eliminated years

B.   Standing

Article III of the Constitution "restricts [this Court] to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." Summers v. Earth Island Inst., 555 U.S. 488, 492 (2009). This "fundamental limitation" is reflected in the doctrine of standing. Id. at 493. That doctrine requires a plaintiff to demonstrate: "(1) an injury in fact which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) that the injury is 'fairly traceable to the challenged action,' and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'" Massachusetts v. U.S. Dep't of Health & Human Servs., 923 F.3d 209, 222 (1st Cir. 2019) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

An association or other organization may litigate claims on behalf of its members if:

> (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals.

United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992).

Justice Souter, writing for a panel of the First Circuit and citing Summers, has explained that the first prerequisite for associational standing requires an organization to, "at the very least, identify a member who has suffered the requisite harm." Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (quotation marks and brackets omitted). "Because standing is fundamental to the ability to maintain a suit, and because . . . the complainant [has] the burden of clearly alleging facts sufficient to ground standing, . . . where standing is at issue, heightened specificity is

---

ago." Doc. No. 57 at 5; see Fed. R. Civ. P. 84. The plaintiffs ceased to champion Form 11 only after Harvard's counsel reiterated during the motion hearing that the form had been abrogated and the Court offered plaintiffs' counsel a current copy of the Federal Rule book. Tr. Mot. Hr'g at 86-87.

obligatory at the pleading stage." AVX Corp., 962 F.2d at 115; see Draper, 827 F.3d at 3 (quoting AVX Corp. and its mandate that a complaint include "reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing"); cf. Defs. of Wildlife, 504 U.S. at 561 (placing the burden of establishing standing on the party invoking federal jurisdiction and explaining "the manner and degree of evidence required" depends on the stage of litigation); Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 151 (1970) ("Generalizations about standing to sue are largely worthless as such.").

### III. DISCUSSION

Each of the three motions to dismiss will be addressed in turn below. First, however, the Court addresses the common—and dispositive—argument made by all of the defendants: that the plaintiffs have not alleged facts sufficient to establish standing.

### A. Standing

The defendants urge that dismissal is required because the plaintiffs have not identified members with standing to challenge the allegedly discriminatory policies and practices in their own right. Doc. No. 43 at 12-15; Doc. No. 45 at 15-24; Doc. No. 47 at 11-17. In response, the plaintiffs insist they have done enough to survive the standing challenge by simply "acknowledg[ing] the existence of individual members who would have Article III standing." E.g., Doc. No. 49 at 9. But more is required than the sparse allegations included in the Amended Complaint. Those allegations fail to establish standing, even at this stage, for at least two reasons.

First, unambiguous decisions binding this Court compel organizations like the plaintiffs to "identify" at least one member who would satisfy the constitutional prerequisites for standing.

Summers, 555 U.S. at 499; Draper, 827 F.3d at 3.[6]  Nowhere, however, does the Amended Complaint "identify"—in any sense of that word—a member of either plaintiff association, let alone one who has suffered or will suffer the requisite injury.

The relevant allegations are:

38.  At least one member of FASORP, and at least one member of CMU, are current students at Harvard Law School who intend to apply for membership on the [sic] Harvard's Law Review, and who will face discrimination on account of their race, sex, sexual orientation, or gender identity unless the Law Review is enjoined from enforcing its discriminatory membership-selection policies.

39.  At least one member of FASORP, and at least one member of CMU, are faculty members or legal scholars who have submitted articles to the Harvard Law Review in the past, and who intend to continue submitting their scholarship to the Harvard Law Review in the future, and who will face discrimination on account of their race, sex, sexual orientation, or gender identity unless the Law Review is enjoined from enforcing its discriminatory article-selection policies.

40.  At least one member of FASORP, and at least one member of CMU, are faculty members or legal scholars who have submitted articles to the Harvard Law Review in the past, and who intend to continue submitting their scholarship to the Harvard Law Review in the future, and who will have their submissions judged and evaluated by less capable students who made Law Review because of diversity criteria, and who leapfrogged students with better grades and writing-competition scores.

\*        \*        \*

42.  At least one member of FASORP, and at least one member of CMU, have sought and applied for entry-level or lateral teaching positions at Harvard Law School and intend to do so again in the future, or remain potential candidates for visiting professorships and lateral faculty appointments without any need to formally apply, and who face or will face discrimination on account of their race and sex unless Harvard University is enjoined from using race and sex preference in its faculty hiring.

Doc. No. 33 ¶¶ 38-40, 42.

---

[6] As Justice Scalia explained in Summers, the Supreme Court has "dispensed with" the requirement "of naming the affected members" only "where *all* the members of the organization are affected by the challenged activity."  555 U.S. at 498-99 (emphasis in original).  The plaintiffs do not claim, nor does the record suggest, that all their members would have standing to bring any claim alleged in the Amended Complaint.

12

In no meaningful way do these paragraphs "identify" members such that their individual standing to pursue claims against any of the defendants might be assessed. For example, without at least some descriptive information, it is impossible to evaluate whether it is plausible that the HLRA applications of the "current students" referenced in paragraph 38 were, or will be, impacted by the challenged component of the member-selection policy.[7]

The plaintiffs vigorously contend that they need not "name names" in order to establish standing to sue on behalf of their members. Doc. No. 49 at 6-7. But the Court need not resolve whether cases like Draper and Summers mandate the naming of names at the pleading stage. It is beyond dispute that such cases explicitly require an association to "identify" a member or members with individual standing, a directive which this Court finds obligates the plaintiffs to supply some degree of descriptive information beyond the threadbare recitals excerpted above. For instance, in a case involving similar claims pending before another session of this Court, a different organization suing Harvard on behalf of its members omitted the name of the member it cited as the basis for associational standing, but included several paragraphs of specific factual allegations establishing—at the pleading stage, in the complaint—that the unnamed member would have had standing to sue on his or her own behalf. See Compl. ¶¶ 15-24, Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., No. 14-cv-14176-ADB, ECF No. 1 (D. Mass. Nov. 17, 2014) (describing the race, ethnicity, academic background, test scores, and extracurricular activities of the "Applicant" who had been denied admission to Harvard and was a member of the plaintiff association).

---

[7] Unlike the category of Equal Protection claims challenging numerical set-asides or quotas, the policy under scrutiny here applies the relevant "holistic review" component only to applicants who are not selected based on their writing competition performance alone or in combination with their grades for one of the first thirty positions.

The plaintiffs have not supplied "reasonably definite factual allegations" identifying any of their members—information readily and uniquely available to the plaintiffs; this failure dooms the Amended Complaint.[8] AVX Corp., 962 F.2d at 115; accord Draper, 827 F.3d at 3.

Second, even if the plaintiffs had identified members with the requisite level of specificity, they have not alleged facts showing the sort of "concrete and particularized," "actual or imminent," and redressable "injuries in fact" necessary to confer Article III standing. Such facts are not supplied in the "at least one member" allegations in paragraphs 39, 40, or 42. Without additional detail, there is no way to discern whether a faculty member or legal scholar referenced in paragraphs 39 and 40 either had an article rejected in the past (suggesting actual harm) or is preparing to submit an article in the reasonably foreseeable future (suggesting imminent harm). Likewise, without more information, the Court cannot assess whether an individual referenced in paragraph 42 can reasonably claim to have suffered, or to imminently face, any injury stemming from Harvard's faculty-hiring practices.

Nor do the other "standing" allegations in the Amended Complaint combine with the excerpted paragraphs to plausibly allege the requisite "injury in fact." Authors who believe that their submissions to HLRA "are judged [and edited] by less capable students" as a result of the member-selection policy, Doc. No. 33 ¶¶ 30-31, lack standing to challenge that policy on behalf of the students directly impacted by it. See Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (applying general rule barring claims by parties seeking to assert violations of "the legal rights or interests of third parties").[9] The same is true of HLRA alumni with concerns about the

---

[8] Whether the absence of such allegations results from the plaintiffs' inability to provide them or an intentional decision not to disclose such facts, the effect on this Court's analysis is the same.
[9] The Supreme Court has reserved for another day "consideration of [the third-party standing] doctrine's proper place in the standing firmament." Lexmark Int'l, Inc. v. Static Control

"diminish[ing] . . . prestige" of HLRA credentials or the "suspicion" with which prior HLRA membership might be viewed as a result of the member-selection policy, if the alumni were not subjected to the policy themselves.[10]  Doc. No. 33 ¶¶ 32-33, 35.

In sum, the plaintiffs' assertions of standing fall woefully short of the requirement that they plead, with "heightened specificity," "reasonably definite factual allegations . . . regarding each material element needed to sustain standing." AVX Corp., 962 F.2d at 115; accord Draper, 827 F.3d at 3.  Their failure to supply even the slightest description of any member who might satisfy the prerequisites for Article III standing—including concrete and particularized, actual or imminent injury redressable by a favorable decision in this case—requires dismissal of the Amended Complaint in its entirety.[11]  Although further discussion is not required in order to allow each of the pending motions to dismiss, the Court deems it prudent to address certain

---

Components, Inc., 572 U.S. 118, 127 n.3 (2014).  The Court, however, does not read Lexmark as supporting plaintiffs' view that the Supreme Court has "abolished" doctrines like third-party standing and zone-of-interest analysis, nor does Lexmark mean that such doctrines have "nothing to do with Article III standing."  Doc. No. 49 at 10-11.

[10] The Court infers from the absence of an "at least one member" allegation referencing HLRA alumni that, when the Amended Complaint was drafted, neither plaintiff included a member who was an alumnus or alumna of HLRA.  To the extent either association does include such a member, concern about the level of prestige or suspicion with which their credential is viewed by others is neither concrete injury, nor is it redressable by this Court via the prospective relief the plaintiffs seek.  Doc. No. 33 ¶ 59.  Likewise, current "female or minority" members of HLRA would not suffer concrete and redressable injury based on a belief that their HLRA membership is "tainted" by the member-selection process.  Id. ¶ 35.

[11] Harvard suggests that a third defect pertaining to standing warrants dismissal of the Amended Complaint: the absence of factual allegations showing that either plaintiff association "genuinely represents its members."  Doc. No. 45 at 21-24.  According to Harvard, First Circuit precedent obligates the plaintiffs to plead "with heightened specificity" facts supporting an inference that members of FASORP and CMU exercise some degree of control over the associations, and demonstrating that the associations are more than "litigation vehicles using their 'membership' lists in an effort to invoke federal jurisdiction."  Id.  The Court need not answer this serious question now, though the issue will require resolution if the plaintiffs amend their complaint in a manner which cures the pleading defects addressed above.

15

alternative arguments presented in the motions in light of the plaintiffs' stated desire to further amend their complaint. Tr. Mot. Hr'g at 101-02.

    B.    <u>HLRA</u>

In its motion, HLRA highlights the plaintiffs' failure to allege that it receives financial assistance from the federal government, and their failure to allege "actionable discrimination based on race or sex." Doc. No. 42 at 1-2. The Court agrees that both deficiencies also warrant dismissal.

To sue HLRA under Titles VI and IX, the plaintiffs must allege it receives federal funding.[12] Besides a conclusory description of HLRA as "a 'program or activity' that 'receives Federal financial assistance,'" Doc. No. 33 ¶ 49, the plaintiffs allege no facts suggesting HLRA is an entity "that receive[s] federal assistance, whether directly or through an intermediary." <u>Nat'l Collegiate Athletic Ass'n v. Smith</u>, 525 U.S. 459, 468 (1999) (hereinafter "<u>NCAA</u>"); see Tr. Mot. Hr'g at 68-69 (reflecting agreement by plaintiffs' counsel that there is no allegation HLRA receives federal funding directly). The Amended Complaint and the exhibits incorporated therein describe HLRA as "formally independent" of Harvard.[13] Doc. No. 33 ¶ 9; Doc. No. 33-1 at 1. Though the plaintiffs allege facts about the relationship between HLRA and Harvard, Doc. No. 33 ¶ 50, those facts merely suggest HLRA "indirectly benefits from . . . federal assistance," <u>NCAA</u>, 525 U.S. at 468—for example, by having members who rely on

---

[12] Whether the plaintiffs have adequately alleged HLRA is a "program or activity" of Harvard—which everyone agrees is a recipient of federal funding subject to Titles VI and IX—is a separate question the Court need not reach at this time.

[13] In fact, at oral argument, plaintiffs' counsel volunteered: "I understand the defendants are asserting that [HLRA and Harvard are separate entities], and I believe them. I believe they're telling the truth." Tr. Mot. Hr'g at 59.

16

federal financial assistance to pay their law school tuition.  They do not support a reasonable inference that HLRA is independently subject to Titles VI and IX.  Id.

Moreover, to state a cognizable claim of unlawful discrimination against HLRA stemming from the processes by which it chooses its members and articles, the plaintiffs must do more than allege that HLRA receives information about applicants' and authors' race and gender (among other characteristics).  Although the plaintiffs describe in detail HLRA's membership-selection process, Doc. No. 33 ¶¶ 14-17, the facts they recount do not support an inference that the process violates federal law.[14]  As both HLRA and the plaintiffs describe it, all students applying to HLRA can be considered for membership at each of the three phases of the selection process.  Even in the "holistic" stage, applicants may (but are not required to) disclose six specified characteristics,[15] and also may (but are not required to) submit an open-ended "expository statement" discussing any "aspects of their background."  Id. ¶ 17.  The plaintiffs do not allege that HLRA awards a fixed benefit to applicants of any race or gender, nor that applicants of any race or gender are excluded from the challenged "holistic" review.[16]  And, they

---

[14] The Court disregards the conclusory and unsupported characterization of the process as including a "fixed, numerical set-aside" or "quota," Doc. No. 33 ¶ 53, as it amounts to a "legal conclusion couched as . . . fact," Ocasio-Hernandez, 640 F.3d at 12 (quotation marks and alterations omitted).

[15] The characteristics are race, ethnicity, physical disability, gender, sexual orientation, and socioeconomic status.  Doc. No. 33 ¶ 17.

[16] As became clear during the motion hearing, if the plaintiffs' allegations here sufficed to weather a Rule 12(b)(6) challenge, then every "education program or activity receiving Federal financial assistance" that (a) uses personal essays or applicant interviews as part of a selection or admission process, and (b) has made a general statement of interest in or commitment to diversity—criteria which likely encompass a vast majority of the nation's universities, colleges, private schools, and other educational institutions—could be subjected to the "costly and burdensome" prospect of discovery arising from lawsuits brought under Titles VI and/or IX, so long as the complaint is signed by a lawyer pursuant to Rule 11.  DM Research, Inc., 170 F.3d at 55; see Tr. Mot. Hr'g at 50-54.  More is required to state a plausible claim of discrimination than the acceptance of information beyond a transcript and a standardized test score.

allege no facts to support an inference that the holistic process, as applied by HLRA, functions in practice as an unlawful quota or set-aside.

Unlike the membership-selection process at issue, the plaintiffs offer no facts whatsoever illuminating HLRA's article-selection process. The complete absence of "factual material" in this regard is fatal to the plaintiffs' claim of discriminatory article selection. The plaintiffs simply may not "proceed perforce by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernandez, 640 F.3d at 12 (quotation marks omitted).

For these additional reasons, the plaintiffs have not pled facts sufficient to justify dragging HLRA past the pleading threshold.

C. Harvard

Harvard's motion raises two more challenges to the Amended Complaint that merit brief discussion now. The plaintiffs accuse HLS of violating Title VI by using a racially discriminatory faculty-hiring process. However, Title VI may serve as a vehicle for challenging discriminatory hiring practices of a federally funded entity only if "a primary objective of the federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. The plaintiffs have not alleged Harvard receives any federal funding with an employment-related objective. Cf. Doc. No. 33 ¶¶ 49-50 (asserting generally that Harvard receives federal funds, and describing in particular students' use of federal financial aid to pay tuition). This omission is fatal to the plaintiffs' Title VI challenge to HLS's faculty-hiring practices.

Further, just as the plaintiffs have made no attempt to describe HLRA's article-selection practices, the Amended Complaint likewise contains no facts—let alone sufficient facts—to illuminate the conclusory assertion that HLS ("along with nearly every law school in the United

States") discriminates on the basis of gender and race when hiring faculty. Doc. No. 33 ¶ 23. As such, their Title VI and Title IX claims against Harvard fail a Rule 12(b)(6) analysis.[17]

    D.    DeVos

The plaintiffs have agreed to dismiss their time-barred APA claim against DeVos. Tr. Mot. Hr'g at 35-36, 80; Doc. No. 47 at 19 n.5. They urge, however, that the Amended Complaint should be read to include a "separate and independent" claim against DeVos under Ex parte Young, 209 U.S. 123 (1908). Doc. No. 50 at 14-15.

The plaintiffs' failure to establish standing justifies dismissal of any claims against DeVos, including one under Ex parte Young. Standing deficiencies aside, the plaintiffs have not plausibly stated an Ex parte Young claim. Nowhere does the Amended Complaint—prepared and signed by counsel—invoke Ex parte Young, though it identifies other specific legal bases for the claims described therein. See Doc. No. 33 ¶ 58 (listing Titles VI and XI and the APA). The plaintiffs' vague reference to "any other law that might supply a cause of action for the requested relief" cannot reasonably be read to place the defendants or the Court on notice of an implied cause of action under Ex parte Young. Id.; see Doc. No. 1 ¶ 37 (reflecting an identical statement in the original complaint). The plaintiffs are not pro se litigants whose pleadings are entitled to liberal construction. That DeVos did not perceive and address in her motion a potential Ex parte Young claim—responding to it only after the plaintiffs raised it, for the first time, in their opposition brief, Doc. No. 50 at 14-15—underscores the fact that such a claim was not obvious from the allegations set forth in the Amended Complaint. See generally Doc. No. 47.

---

[17] For the reasons stated in the preceding subsection, the plaintiffs have not adequately pled their challenges to HLRA's member- and article-selection practices, regardless whether those challenges are aimed at HLRA independently or at Harvard. See § III(B), supra.

Because the Amended Complaint neither provides fair notice of an Ex parte Young claim nor plausibly states such a claim, Rule 12(b)(6) requires dismissal as to DeVos.[18]

## IV. CONCLUSION

Because the plaintiffs have not alleged facts sufficient to establish associational standing or to plausibly state claims under Title VI, Title IX, or Ex parte Young, the defendants' motions to dismiss (Doc. Nos. 42, 44, and 46) are ALLOWED.  The Amended Complaint (Doc. No. 33) is DISMISSED without prejudice.

If the plaintiffs wish to file a second amended complaint remedying the deficiencies identified herein, they must seek leave to do so within thirty days of this Order.  The plaintiffs shall attach a copy of their proposed second amended complaint to any such motion.

If the plaintiffs move to amend their complaint, the defendants shall have thirty days to oppose the motion, with any reply by the plaintiffs due fourteen days after any oppositions are filed, and any surreplies by the defendants due fourteen days after the reply is filed.  No further leave is required for the listed submissions.  The reply and any surreplies shall be limited to five pages in length.  In their briefs, the parties may address issues raised by the request for leave to amend as well as issues that might arise under Rule 12, so that the resolution of the motion for leave to amend will determine whether the proposed amended pleading provides a basis upon which to proceed with the lawsuit.

SO ORDERED.

  /s/ Leo T. Sorokin  
United States District Judge

---

[18] In light of this conclusion, the Court need not resolve whether Ex parte Young ever provides a basis for a cause of action against a federal official.  See Doc. No. 56 at 12-13 (arguing the doctrine is limited to claims against state officials and cannot be used to circumvent the APA's statute of limitations).